ROGERS, J., delivered the opinion of the court in which, GILMAN, J., joined and SUTTON, J., joined in part.
SUTTON, J. (pp. 677-87), delivered a separate opinion concurring in part and in the judgment.
OPINION
ROGERS, Circuit Judge.
Plaintiff Candido Romo was sitting in the driver’s seat of a parked car, intoxicated, when he was approached by defendant Officer Jeff Largen. Largen arrested Romo for operating a vehicle while intoxicated, assertedly based on Largen’s observation of Romo’s having driven the car minutes earlier. Romo contends that he had not been driving. Romo filed a § 1983 suit claiming that Largen violated his constitutional rights and committed several intentional torts. The district court denied Largen’s qualified-immunity motion for summary judgment, finding among other things that a jury could disbelieve Largen’s claim that he had previously seen a very similar car being driven in violation of traffic laws. Without such prior observation, Largen lacked probable cause to arrest Romo. Because this is an interlocutory appeal, we are bound by the district court’s finding that a genuine dispute of material fact existed as to whether Largen had observed such activity, in the absence of objectively incontrovertible evidence that he had. We therefore affirm the district court’s denial of qualified immunity on Romo’s § 1983 claim. The district court also properly permitted some of Largen’s state-law claims to proceed.
*672 On November 6, 2010, Candido Romo was supposed to meet his brother and brother-in-law at a bar. However, because the bar’s parking lot was full, he left his vehicle, a silver Dodge Ram pickup, at a restaurant across the street. Romo and his brother-in-law began drinking, while his brother served as the designated driver. They drove in Romo’s brother’s truck to several bars, and Romo consumed approximately nine beers over the course of the night. At the end of the night, Romo’s brother left Romo back at his vehicle. Although it was 35 degrees outside, Romo insisted on spending the night in his truck, instead of staying with his relatives or being driven home, because he was afraid the truck would be vandalized. To ensure that Romo would not drive drunk, his brother took Romo’s keys, planning to return them in the morning when the three met up again for breakfast. Romo sat in his truck, leaned on his center console, and fell asleep.
Approximately forty-five minutes later, Romo awoke to a tapping on his window. Because Romo’s car had power windows and he did not have the keys, he opened the door to see Officer Jeff Largen standing outside. Largen asked Romo what he was doing, and Romo responded that he was “waiting this out.” Over the next ten minutes, Largen asked Romo about his night, how he was doing, and whether and how much he had been drinking. Finally, Largen asked “do you know why I pulled you over?” Romo responded by stating that the officer did not pull him over because he was not driving. Largen asked Romo if he had passed a semi tanker by the railroad tracks, and Romo responded that he had “been here for a while.” Romo also told Largen that his brother had taken his keys some time before. At this point, Largen activated his microphone and offered to “start this conversation over” because “the more you lie to me, the more you’re likely to go to jail.” Largen then continued to accuse Romo of passing a semi tanker at a railroad crossing and Romo repeatedly answered “I don’t know what you’re talking about.”
After this line of questioning proved unfruitful, Largen asked Romo to step out of the truck and administered sobriety tests. Romo responded by stating again that he was not driving, saying “my keys aren’t even in the trunk.”[1] Largen did not respond to this statement. Largen took Romo through several sobriety tests and, after Romo failed, Largen arrested Romo for operating a vehicle while intoxicated. They then had the following exchange:
ROMO: ... Why’d you pull me over?
OFFICER: For about the fifth time, because you passed that semi when you were in the crossing area.
ROMO: I wasn’t driving.
OFFICER: Okay. That’s your story, sir. You can keep that story. My story’s gonna be something different though, okay?
ROMO: I was sitting back there just relaxing.
After putting Romo in his car, Largen asked if Romo wanted his wallet or his phone from the truck, and Romo declined. Largen then stated: “Okay. Do you have — you don’t have the keys on you. Are they in the vehicle?” Romo responded: “Umm, yeah. I’ve been sitting there for a while.”
As Largen explained why he was arresting Romo, Romo continued to protest his innocence. Largen responded by telling Romo to “[sjave it for the Judge.” Romo promised to do so and asked Largen, who *673 had been rifling through the car, if he had found the keys. Largen responded that Romo had said that he did not want the car locked, and Romo stated that he had given the keys to his brother over an hour previously. Largen then waved his hand over the car’s hood without touching it and said “I’m sure. That’s why the engine’s still warm to the touch.” Largen then drove Romo to the jail. All charges against Romo were later dismissed.
Largen filed a police report that described the incident. In the police report, Largen claimed to have seen in his rear-view mirror “a tan Dodge Ram pass a semi tanker in the railroad crossing no passing zone.” He stated that he “turned on the truck and then pulled behind it” and that the “truck had pulled into the parking lot behind Big T and stopped.” The police report noted that Romo had denied driving and had stated “I wasn’t driving my kids aren’t even in the car.” In the police report, Largen claimed that he “placed [his] hand on the hood of the truck and it was warm” although since it was “less than 35 degrees ... the hood would have been cold [had Romo not recently driven the truck.]” Largen would later clarify that he did not follow the Dodge Ram into the Big T parking lot. Instead, he “pulled a U-turn and lost sight of it for a second, couple seconds, whatever.” He then did another U-turn, to face the direction the Dodge was going, but it was nowhere in sight. At that point, he decided that it likely headed west down a different street, and turned down that street. It was only at that point that he saw Romo’s vehicle.
Romo filed suit under 42 U.S.C. § 1983 and Michigan law. His complaint included federal claims of false arrest and malicious prosecution. The complaint also stated, without elaboration, that Largen “violated [Romo]’s right to equal protection.” Romo also claimed that Largen committed the intentional torts of false arrest, false imprisonment, and malicious prosecution. Largen claimed qualified and governmental immunity and moved for summary judgment.
The district court determined that there were “at least three basic narratives possible from what’s going on here.” The first is that Largen fabricated the background story.
That he never really did see a truck pass a semi on the right over the railroad track no matter what color it was. That he simply happened upon this truck in a parking lot, seen somebody sleeping in there, and then the rest unfolds into the arrest, and that he made up the whole story.
In that case, the district court noted that “a reasonable fact-finder could conclude no reasonable officer, mistaken or otherwise, could conclude there’s probable cause on that. And that’s, I think, on a record like this, enough to send the case to the jury.” The district court later noted that “a jury conceivably could discount” Largen’s story.
The second possible narrative is that Largen’s story, including the warm hood, is entirely correct. In that case, the district court noted that probable cause may have existed. However “that’s not a story [the court] can accept for purposes of evaluating a defense motion for summary judgment.”
The court, like the parties, spent the most time on the third possible narrative. In that version of the story, Largen “ma[d]e up the part about the warm hood and the warm engine, but then he really did see a Dodge truck pull alongside the semi on the railroad tracks, saw it in his rear-view mirror, ... [but] didn’t have continuous contact, [and] the colors [of the trucks] were different.” Id. “[E]ven if that’s the scenario,” the court determined, “summary judgment would be inappropriate.”
*674 The district court stated that while a jury may “ultimately agree with the officer on the defense theory, ... it’s one of those cases that should be the jury’s call as opposed to my call” and denied summary judgment on the federal false-arrest claim. The court also denied summary judgment on the state-law claims because they are similar, albeit with a malice requirement that the court determined was fact oriented. Finally, the district court denied summary judgment on the federal malicious-prosecution claim, finding that bond conditions may be enough of an additional deprivation of liberty to fulfill the requirements for that claim.
Largen now appeals. He argues that he is entitled to qualified immunity for his “reasonable but mistaken belief that Romo was driving the pickup truck [he] observed commit a traffic violation.” He also argues that the state-law claims should have been dismissed because he acted in good faith, that the federal malicious-prosecution claim should have been dismissed because the charges against Romo were dismissed, and that the equal-protection claim, which was not discussed below, should be dismissed.
While the parties argue extensively about the third scenario, the district court’s treatment of the first scenario is sufficient for affirmance. In adjudicating this appeal, we are required by the limitations on interlocutory appeals of qualified immunity denials to accept the district court’s finding that a genuine dispute of material fact existed as to whether Largen fabricated the whole or a part of his story about seeing a Dodge Ram pickup pass a semi tanker, and we refuse to consider Largen’s factual disputations to the contrary.[2] In the Supreme Court’s words, “a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court’s summary judgment order insofar as that order determines whether or not the pretrial record sets forth a ‘genuine’ issue of fact for trial.” Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); see also Kirby v. Duva, 530 F.3d 475, 481 (6th Cir.2008) (“[T]his court may simply ignore defendants’ attempts to dispute plaintiffs’ version of the facts, obviating the need to dismiss the entire appeal for lack of jurisdiction.” (internal quotation marks omitted)).[3] It follows that Largen’s qualified- *675 immunity defense clearly fails. No reasonable officer would believe that he could constitutionally arrest a person found sleeping in a truck and take that person to jail for drunk driving, particularly after the person offers a cogent explanation for sleeping in the truck and shows that he does not even have the truck’s keys. We therefore uphold the judgment of the district court denying summary judgment to Largen on the basis of qualified immunity.
Relying on Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), and policy considerations, the concurrence suggests a “reading” of Johnson under which defendants may generally challenge on interlocutory appeal a district court’s determination that the summary judgment standard has been met with respect to factual inferences (although, in concept at least, not to facts that underlie such inferences). Such an approach is facially contradicted by the Supreme Court’s instructions in Johnson to “take, as given, the facts that the district court assumed when it denied summary judgment” and, when that is unclear, to “determine what facts the district court ... likely assumed.” Johnson, 515 U.S. at 319, 115 S.Ct. 2151. The Court considered and dismissed the criticisms of this approach that the concurrence raises. See id.
Thus, to accept the reading of Johnson advocated by the concurrence, we would have to read Scott to have foreshadowed the overruling of Johnson's, explicit holding.[4] It may be proper in very clear situations for a lower court to anticipate the Supreme Court’s overruling of one of its precedents.[5] But such instances should be limited to the most compelling of inferences from intervening cases. See United States v. Koch, 383 F.3d 436, 441-43 (6th Cir.2004). Indeed, the Supreme Court— albeit in dictum — has admonished the lower courts not readily to anticipate the overruling of its prior holdings. See, e.g., Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). In the words of Learned Hand, it is not “desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.” Spector Motor Serv. v. Walsh, 139 F.2d 809, 823 (L.Hand, J., dissenting) (2d Cir.1943), vacated sub nom., Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). The instant appeal hardly presents a situation in which to disregard such admonitions. The Scott opinion did not even mention the Johnson holding, and Scott is easily limited as an exception for blatantly contradicted facts. It is up to *676 the Supreme Court to overrule Johnson, and Scott does not provide us a basis for anticipating' — much less predicting with compelling confidence — that the Supreme Court will do so.
We next consider Largen’s appeal of the denial of governmental immunity on Romo’s state-law claims. Viewing the facts in the light most favorable to Romo, Largen did not have probable cause to arrest Romo for operating while intoxicated and a jury could find that Largen acted with malice. The district court properly denied governmental immunity to Largen. Largen did not have any evidence that Romo was operating the truck. Largen found Romo intoxicated and sleeping in his truck. Since people rarely sit in their vehicles without driving them, Largen could reasonably suspect that Romo either had driven or was planning to drive while intoxicated. However, Romo’s responses to Largen’s questioning should have dispelled those suspicions. Romo explained that he was sleeping off a night of drinking, that he had not been driving, and that he could not drive because he did not have the keys. Although Largen claims that he heard Romo say that his kids, rather than his keys, were in the truck, he later states “you don’t have the keys on you,” suggesting that he had heard Romo say he did not have the keys at some point during the conversation. Romo also stated in his deposition that he told Largen that his brother had taken his keys before Largen even turned on the microphone. Romo had a reasonable explanation and Largen had no inculpatory evidence.
Drunk driving is a serious danger to the public, and police are properly suspicious of anyone sitting in his car drunk. However, they need more than presence in the driver’s seat of a vehicle for probable cause. For example, in Nettles-Nickerson v. Free, the plaintiff had started her car, her brake lights had turned on, and she sat in it while it was running. 687 F.3d 288, 291 (6th Cir.2012). This court determined that in such a situation, a police officer can reasonably believe that the plaintiff was operating the car. The court noted that “nothing impeded NettlesNickerson’s ability to move the car” and that she was “able, at any moment, to drive away.” Id. at 291-92. In contrast, Romo could not possibly drive anywhere because he did not have the keys. The Michigan Court of Appeals has found that a person operates a car once it is put into gear. See City of Plymouth v. Longeway, 296 Mich.App. 1, 818 N.W.2d 419, 424 (2012). However, if the car is in “park” or not even running, and the person is asleep, then he is not operating the car. See Michigan v. Burton, 252 Mich.App. 130, 651 N.W.2d 143, 151 (2002); Michigan v. Andres, No. 258280, 2006 WL 448811, at *5 (Mich.Ct.App. Feb. 23, 2006). The only exception is if there is evidence that the person had driven the car while intoxicated to the location where the officers found it. See Michigan v. Stephen, 262 Mich.App. 213, 685 N.W.2d 309, 313 (2004). However, Largen had no evidence that Romo had driven the car to the parking lot after drinking, and Romo explained that his brother had driven him there and took his keys so that he could not drive.
To be entitled to governmental immunity under Michigan law, a lower-level government official accused of an intentional tort must show that:
(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
(b) the acts were undertaken in good faith, or were not undertaken with malice, and
(c) the acts were discretionary, as opposed to ministerial.
*677 Odom v. Wayne County, 482 Mich. 459, 760 N.W.2d 217, 228 (2008). The only question here is whether Largen was acting in good faith or with malice. A police officer is entitled to governmental immunity “if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken.” Id. at 229. This test is subjective, not objective. Id. Largen argues that since the district court stated that “the officer sounds like he believes what he’s talking about,” he is entitled to governmental immunity. However, the court also found that “a reasonable fact-finder could still draw an inference of actual malice.” Moreover, if Largen lied on his police report and to the prosecutor in order to obtain a prosecution of Romo, that is strong evidence of malice. Accordingly, Largen is not entitled to governmental immunity on Romo’s state-law claims.
On the other hand, Largen is entitled to summary judgment on Romo’s federal malicious-prosecution and equal protection claims because Romo has stated that he is no longer pursuing these claims. See Romo Br. at 38-39.
The district court’s denial of qualified immunity with respect to Romo’s federal malicious-prosecution claim is reversed. The judgment of the district court is otherwise affirmed.

. Although the written transcript of the encounter uses the word ‘‘trunk/’ the last word of the sentence is unclear on the tape and Romo more likely said "my keys aren't even, in the truck,” as Romo’s vehicle was a pickup truck and did not have a trunk.

. This limitation is not prudential, optional, or discretionary. It derives from the limited nature of our interlocutory appellate jurisdiction under 28 U.S.C. § 1291 as interpreted in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The limitation is in that sense "jurisdictional.” The fact that at the end of this opinion we "affirm" rather than "dismiss" reflects that we are ruling on what is properly before us, and says nothing about what is jurisdictionally not before us.

. This court may reverse, notwithstanding Johnson v. Jones, "where the trial court’s determination that a fact is subject to reasonable dispute is blatantly and demonstrably false.” Moldowan v. City of Warren, 578 F.3d 351, 370 (6th Cir.2009) (quoting Wysong v. City of Heath, 260 Fed.Appx. 848, 853 (6th Cir.2008)). This principle arises from Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), which the Third Circuit described as "the outer limit of the principle of Johnson v. Jones." Blaylock v. City of Phil., 504 F.3d 405, 414 (3d Cir.2007). This court has followed the Third Circuit’s analysis. See Bishop v. Hackel, 636 F.3d 757, 769 (6th Cir.2011); Carter v. City of Wyoming, 294 Fed.Appx. 990, 992 (6th Cir.2008); Wysong, 260 Fed.Appx. at 853. In Scott, the plaintiff's version of the facts, which the district court accepted, was "so utterly discredited by the record,” which included a video of the incident, "that no reasonable jury could have believed him.” 550 U.S. at 380, 127 S.Ct. 1769. Thus, in cases where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summaiy *675 judgment.” Id. If a district court ignores this instruction and accepts the blatantly contradicted facts, "a court of appeals may say so, even on interlocutory review.” Wysong, 260 Fed.Appx. at 853 (quoting Blaylock, 504 F.3d at 414). This "represents a principled way to read Johnson and Scott together and to correct the rare blatant and demonstrable error without allowing Scott to swallow Johnson." Carter, 294 Fed.Appx. at 992 (internal quotation marks omitted). This exception does not apply here.

. We do not mean to suggest that the concurrence is advocating that we disregard Johnson in anticipation of its being overruled.

. The Fourth Circuit in 1955, for instance, extended the Supreme Court’s rejection of the constitutional separate-but-equal doctrine to public transportation cases — notwithstanding Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), a separate-but-equal public transportation case — based on the Supreme Court's then-recent rejection of the separate-but-equal doctrine in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which was decided in the distinct context of school desegregation. See Flemming v. S.C. Elec. & Gas Co., 224 F.2d 752 (4th Cir.1955).