RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KATHRYN POLLARD, Individually and as the Executrix of the Estate of Abram Bynum,

*Plaintiff-Appellee*,

*v.*

CITY OF COLUMBUS, OHIO; NATHAN AMSTUTZ; EMANUEL EDWARDS; WILLIAM EDWARDS; JAMES ESTEPP; TIMOTHY O'DONNELL; MICHAEL YINGER,

*Defendants-Appellants*.

No. 13-4142

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00286—Algenon L. Marbley, District Judge.

Argued: January 16, 2015

Decided and Filed: March 5, 2015

BEFORE: McKEAGUE and KETHLEDGE, Circuit Judges; HOOD, District Judge.[*]

---

## COUNSEL

**ARGUED:** Paula J. Lloyd, CITY OF COLUMBUS, Columbus, Ohio, for Appellants. J. Eric Holloway, ERIC HOLLOWAY LAW GROUP, LLC, Dublin, Ohio, for Appellee. **ON BRIEF:** Paula J. Lloyd, Pamela J. Gordon, CITY OF COLUMBUS, Columbus, Ohio, for Appellants. J. Eric Holloway, ERIC HOLLOWAY LAW GROUP, LLC, Dublin, Ohio, for Appellee.

---

[*]The Honorable Joseph M. Hood, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

---

**OPINION**

---

McKEAGUE, Circuit Judge.  On July 7, 2009, a rape suspect led Columbus, Ohio police officers on a highway car chase before crossing the median, accelerating the wrong way, and ramming head on into a semitrailer.  Officers surrounded the suspect's car and fatally shot the suspect after he reached down into the car, despite police commands to "show his hands," and then clasped his hands into a shooting posture, pointing them at the officers.  The suspect's mother, Kathryn Pollard, brought a 42 U.S.C. § 1983 suit against the officers, alleging excessive force in violation of the Fourth Amendment.  We reverse the district court's denial of qualified immunity because the suspect's conduct gave the officers probable cause to believe the suspect had a gun and thereby posed a threat of serious physical harm.

**I.**

During the summer of 2007, Abram Bynum became a suspect in several rapes around Los Angeles, California.  A swab of Bynum's DNA matched samples from five different crime scenes, and a warrant was issued for Bynum's arrest on several charges, including forcible rape, assault with a deadly weapon, burglary, and kidnapping.  Because Bynum had moved to Columbus, Ohio, where his twin brother lived, the Columbus Division of Police (CPD) was called to assist with the arrest.

On the morning of July 7, 2009, a team of Columbus officers, including Michael Yinger and John O'Donnell, began surveillance on Bynum. L.A. detectives were scheduled to arrive in Columbus that afternoon, and the plan was to arrest Bynum following their arrival.  The team set up outside the brothers' apartment and tracked the brothers as they drove around Columbus before returning to their apartment at 3:35 PM.  While the brothers were in the apartment, Yinger and another officer phoned supervisor Sergeant Terry McConnell. McConnell told the officers to arrest Bynum and detain his brother if they left again.  Moments later, the brothers left the apartment, driving in separate vehicles and in different directions.

The surveillance team split up and Yinger and O'Donnell began following Bynum from their unmarked vehicle. As they drove, McConnell radioed for a marked cruiser to make the arrest. The arrest charges, McConnell explained, were out of the sexual abuse squad and Bynum was potentially armed. Nathan Amstutz, driving in Cruiser 91, responded and drove behind Bynum's Cadillac, his lights and siren activated. Bynum refused to stop, leading Amstutz through several streets and running five stop signs. Two other cruisers, Cruiser 144 carrying James Estepp and Curtis Kinney and Cruiser 143 carrying William Edwards and Emanuel Edwards, later joined the pursuit. At this point, a total of four vehicles were following Bynum— the surveillance car with Yinger and O'Donnell and the three cruisers with Amstutz, Estepp, Kinney, W. Edwards, and E. Edwards.

Around 3:55 PM, Bynum entered I-70 East, zigzagging through highway traffic. Bynum drove for some time before eventually crossing the median. But instead of making a U-turn, Bynum drove against traffic down I-70 West and accelerated toward a semitrailer in the center lane. The semitrailer swerved to avoid Bynum but Bynum swerved to meet it, leading to a head-on collision. The Cadillac spun to a halt on the inside shoulder. The car's front end was badly damaged, the car's hood was jammed upward, the doors were smashed in, and the windows were shattered.

After the collision, the cruisers and surveillance car approached the Cadillac as it was radioed that the Cadillac's driver had a concealed-carry permit, information which later proved false as the permit was possessed by Bynum's brother. Video from Cruiser 91's dashboard camera shows that Kinney and Estepp were the first on the scene (15:59:12[1]). Seconds later, Amstutz exited his cruiser and approached as well (15:59:15). Amstutz and Estepp stood on the driver's side while Kinney stood on the passenger's side (15:59:23). The video shows the officers peering into the Cadillac and two officers unsuccessfully trying to open the car doors (15:59:28). One officer can also be seen sticking his hands through the passenger-side window (15:59:28).

---

[1]The clock on Cruiser 91's dashboard camera was not adjusted for Daylight Savings Time. Appellant Br. 14 n.3. As a result, the times on the video are one hour behind the actual times. The times used in this opinion are the actual times, not the times on the video.

Yinger and O'Donnell next approached while Amstutz radioed that Bynum appeared unconscious and that Amstutz would leave to check on the semitrailer driver (15:59:33). Then the video shows the officers surrounding the Cadillac all take a pronounced step away from the Cadillac (15:59:52), in apparent response to Bynum moving inside. The inside of the Cadillac and any movement from Bynum are not visible from the video.

According to the officers' testimony and eyewitness reports, after Bynum regained consciousness, he reached down into the Cadillac. Several described Bynum appearing to reach toward the floorboard as though searching for something. (*See* R. 33-5, Page ID # 338, ¶ 29; R. 33-8, Page ID # 349, ¶ 25; R. 51-15, Page ID # 1383.) The officers ordered Bynum to "show his hands." But instead of showing his open palms, Bynum extended his arms and clasped[2] his hands into a shooting posture, pointed at the officers. Several officers called out "Don't do it" and a civilian eyewitness heard one officer order Bynum to "Drop it." Bynum responded by reaching down into the Cadillac again before making the same shooting posture. (*See* R. 33-5, Page ID # 338, ¶ 30; R. 33-8, Page ID # 350, ¶ 29.) At 16:00:06, roughly eight seconds after Bynum's initial movement, Yinger and O'Donnell shot at Bynum. The volley lasted roughly three seconds.

After the volley, Amstutz, E. Edwards, and W. Edwards raced in, weapons drawn. (16:00:20.) According to the officers and eyewitnesses, Bynum again reached down into the Cadillac and pointed his hands in the clasped shooting posture. (*See* R. 33-13, Page ID # 385.) A second volley of shots was then fired at 16:00:21 by Yinger, Estepp, Amstutz, E. Edwards, and W. Edwards.[3]

In total, the officers fired 80 shots at Bynum, killing him. The autopsy report states that 23 of the bullets struck Bynum. No gun was ever recovered from the Cadillac.

---

[2]The district court refers to Bynum as pointing a set of "cupped hands" at the officers. However, the officers all describe Bynum's hands as being "clasped" with several adding that Bynum's hands were clasped "as if he had a gun," "in a shooting posture," or "like when we're practicing shooting." One officer, Estepp, does state that Bynum's "left hand cupped his right hand" but also explains that the hands were "clasped together in a shooting posture."

[3]The district court states that only four officers (Yinger, Amstutz, E. Edwards, and E. Edwards) fired in the second volley. (R. 66, Page ID # 2165.) However, Estepp clearly states in his affidavit that he fired in the second volley, ("I fired my service weapon to eliminate that threat," (R. 33-8, ¶ 30)), but not in the first volley, ("I did not shoot." (R. 33-8, ¶ 28)).

Kathryn Pollard, Bynum's mother, brought this § 1983 claim as administrator of her son's estate. Pollard also brought a *Monell* claim against the City of Columbus and state-law claims against the officers, including wrongful death. The officers and the City moved for summary judgment. The district court granted the motion as to all state-law claims except for wrongful death and denied the motion on the § 1983 and *Monell* claims, declining to grant qualified immunity. This interlocutory appeal followed.

## II.

### A.

The threshold question we face is whether we have jurisdiction to entertain the officers' interlocutory appeal. Pollard claims we do not and has filed a motion to dismiss this appeal for lack of jurisdiction. Ordinarily, the denial of summary judgment is not a "final order" and thus not immediately appealable. 28 U.S.C. § 1291. But under the "collateral order" doctrine, any summary judgment order denying qualified immunity is immediately appealable to the extent it is "based on a pure issue of law." *Leary v. Livingston Cnty.*, 528 F.3d 438, 447–48 (6th Cir. 2008).

The district court denied the officers summary judgment, finding a "genuine issue of material fact as to whether Defendants' actions were objectively reasonable." We, however, are not bound by a district court's findings when deciding the availability of our own jurisdiction. *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Pollard disagrees. Pointing to *Romo v. Largen*, 793 F.3d 670 (6th Cir. 2013), she argues an appeals court *must* accept a district court's findings of genuine dispute.

But in *Romo*, the dispute barring summary judgment was a classic factual dispute. That is, a dispute over *which set of facts to believe*: whether the officer saw the arrestee's pickup pass a semitanker before arresting him or whether the officer made the story up. *Id.* at 674. Under those circumstances, the *Romo* court was properly bound by the district court's finding that competing factual narratives existed and that it could not, at summary judgment, choose between them. *Id.*

Unlike in *Romo*, we are not presented with "dueling accounts of what happened." *Id*. at 670. Pollard asserts that, at the time the officers fired, Bynum was unarmed, injured, and trapped in the Cadillac. However, the officers do not dispute that account. *See* Appellant Br. at 20 (Bynum in auto accident involving injury), 37 (no gun in the Cadillac), 51 (Bynum could not escape). They simply maintain that, despite being unarmed, injured, and trapped, Bynum was still a threat, first, because he appeared to have a gun and, second, because they had strong reason to believe he would use the gun. Because the officers "concede the facts in the light most favorable to [the appellee], they "raise *a pure issue of law*," *Mingus v. Butler*, 591 F.3d 474, 479 (6th Cir. 2010), which this court may entertain on appeal. Thus, we deny Pollard's motion to dismiss for lack of jurisdiction with respect to the officer–defendants.

**B.**

Because a municipality is not entitled to qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 657 (1980), the collateral order doctrine does not extend to summary-judgment orders on municipal-liability claims. Nevertheless, to the extent the issues raised in the City of Columbus's appeal are "inextricably intertwined" with the officers' claims of qualified immunity, we may exercise pendent jurisdiction over the appeal. *See Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir. 2007).

The deprivation of a constitutional right is a prerequisite to municipal liability under § 1983. *See Weeks v. Portage Cnty. Exec. Offices*, 235 F.3d 275, 279 (6th Cir. 2000). Thus, there is a clear connection between the City's appeal and the officers' claims of qualified immunity. If the officers did not commit a constitutional violation, Pollard's municipal-liability claim necessarily fails because the prerequisite for municipal liability is not met. Conversely, if the officers committed a constitutional violation, the prerequisite has been met and Pollard can proceed with her claim against the City. As such, the City's appeal is "inextricably intertwined" with the officers' appeal, and Pollard's motion to dismiss for lack of jurisdiction is DENIED with respect to the City.

**III.**

**A.**

Turning to the merits, we review de novo a district court's order denying qualifying immunity. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). "Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violate the law." *Chappell*, 585 F.3d at 907. The first step in a qualified immunity analysis is to ask whether the public official's conduct violated a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If a constitutional right was violated, the second step is to ask whether the right was clearly established at the time of the violation, such that "a reasonable officer confronted with the same situation would have known that using deadly force would violate that right." *Chappell*, 585 F.3d at 907. Because we conclude Bynum's constitutional rights were not violated, we reach only step one of the analysis.

**B.**

To start, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Id.* (quotation omitted). Here, the district court failed to conduct this individualized analysis, instead observing that the officers' aggregate conduct could be found to violate the Fourth Amendment. (*See* R. 66, Page ID # 2168.) Although an individualized analysis does not make a difference on these facts, it must still be done to ensure that a defendant's liability is assessed based on his own individual conduct and not the conduct of others. *See Binay*, 601 F.3d at 650.

Here, the individualized analysis shows each officer–defendant actively participated in the use of force. Each officer confirms, by affidavit or by deposition, that he shot at Bynum— Yinger and O'Donnell during the first volley and O'Donnell, Estepp, Amstutz, E. Edwards, and

W. Edwards during the second. Moreover, each officer when deciding to shoot was operating under the same universe of facts regarding Bynum. The officers were all listening to the same police radio and following Bynum as he sped along I-70 and crashed into the semitrailer. Thus, each officer can be held liable if the force against Bynum was indeed excessive.

**C.**

Pollard alleges that the officers' use of force was excessive and, specifically, that it violated a key teaching from *Tennessee v. Garner*, 471 U.S. 1 (1985): that "a police officer may not use deadly force simply to prevent the escape of a felony suspect." *Id*. at 1. Pollard's claim is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).

Ultimately, her claim fails because she assumes Bynum was shot to prevent his escape. But as the officers explain in affidavits and deposition testimony, their concern was not that Bynum would escape. To the contrary, the officers *knew* Bynum would not escape, given his injuries and the damage to the Cadillac. Appellant Br. at 51. They shot because, after Bynum repeatedly made a shooting gesture, they thought he had a gun and considered him a threat. As one officer explained, "I immediately fired my rifle at Bynum because I believed he posed a serious, immediate, deadly threat to me and the other officers." (R. 33-5, Page ID # 338.)

*Garner* establishes that "law enforcement officers may employ deadly force where the officer has *probable cause* to believe that the suspect poses a *threat of serious physical harm*, either to the officer or to others." *Garner*, 471 U.S. at 11 (emphasis added). Thus, if the record shows the officers had probable cause to believe Bynum posed a serious threat, their use of deadly force was constitutionally permissible. In making this assessment of probable cause, we must consider "the totality of the circumstances," *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006), "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396.

Here, the totality of the circumstances clearly gave the officers probable cause to believe Bynum threatened their safety. The officers knew from police radio that Bynum was wanted on serious rape charges and was potentially armed, and they were told he had a concealed-carry

permit. That Bynum was actually unarmed and did not have a permit is beside the point; what matters is the reasonableness of the officers' belief as they "did not and could not have known" otherwise. *See Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991). Additionally, the officers knew Bynum was determined to avoid arrest, even at the expense of others' safety and his own life. In fact, Bynum was so determined to avoid arrest he chose to engage in a high-speed car chase and drive head-on into a semitrailer rather than surrender. Bynum "had proven he would do almost anything to avoid capture." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). As such, the officers could reasonably "assume he would not stop at threatening others." *Id*.

Pollard suggests Bynum did not "pose any threat after his vehicle collided head on with [the] tanker trailer, as he sat (apparently unconscious) in his disabled vehicle, without a weapon." Appellee Br. at 41. But the officers did not shoot Bynum while he sat unconscious in the Cadillac. They shot *after* a dramatic change in circumstances—after Bynum regained consciousness and made gestures suggesting he had a weapon, gestures he continued to make even after officers told him to "Drop it" and "Don't do it." It is these facts immediately preceding the shooting which weigh most heavily in assessing the officers' split-second decision to shoot. *See Greenidge v. Ruffin*, 927 F.2d 289, 792 (4th Cir. 1991), *cited with approval in Dickerson*, 101 F.3d at 1162.

The "tense, uncertain and rapidly evolving" nature of the altercation with Bynum is apparent from the video. *See Graham*, 490 U.S. at 397. When the officers think Bynum is unconscious, they approach without hesitation, peering through the windows and attempting to open the car doors. Then suddenly, the officers all take a pronounced step back, startled by something inside the Cadillac. As the officers attest, what startled them was Bynum's sudden movement, forcing them to quickly assess the threat Bynum posed and to quickly conclude that Bynum posed a threat even in his injured, immobilized state. If Bynum had a gun, as the officers reasonably thought he did, they were at risk of serious injury or death and thus could reasonably consider Bynum a threat. *See Freland*, 954 F.2d at 347 ("[H]ad [the suspect] in fact retrieved a gun from his seat, he could have caused injury or death despite the presence of numerous police officers." (quoting *Reese*, 926 F.2d at 501).

Because the undisputed record shows the officers had probable cause for believing that Bynum posed a threat of serious harm, the use of deadly force was constitutionally permissible. Accordingly, we reverse the district court's denial of qualified immunity.

**IV.**

We readily dispose of Pollard's two remaining claims, starting with her claim of municipal liability. She alleges the City has a policy of authorizing deadly force against a suspect "based upon merely alleged failure to follow commands, when no weapon has been observed," and that this policy is what led to Bynum's death. But as the City correctly observes, the constitutional violation of a municipal official is a prerequisite to municipal liability. *See Weeks*, 235 F.3d at 279. Because the officers did not commit a violation of Bynum's constitutional rights, Pollard's claim of municipal liability must fail and the district court's denial of summary judgment on that claim is reversed.

Lastly, Pollard brings a state-law claim for wrongful death against the officers. Ohio law grants immunity to an employee of a political subdivision if, *inter alia*, "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). The district court denied the officers' motion for summary judgment, holding that a jury could find the officers' decision to shoot reckless. If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum. Accordingly, we reverse.

**V.**

For the foregoing reasons, we REVERSE the district court's denial of the officers and the City's motions for summary judgment.