# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2015

No. 14-41003

Lyle W. Cayce
Clerk

YANETH FUENTES; HECTOR ALFONSO FUENTES; VICTOR JAVIER FUENTES; KIMBERLY YURI FUENTES; JUAN FUENTES; ANGELICA FUENTES,

>        Plaintiffs - Appellees

v.

MATTHEW RIGGLE,

>        Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:14-CV-179

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

PER CURIAM:*

Defendant-Appellant Matthew Riggle appeals the district court's denial of his motion for summary judgment, which was premised on qualified immunity. For the following reasons, we DISMISS this appeal for lack of jurisdiction.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-41003

I.

At 12:03 a.m. on January 1, 2013, dispatch called for officers to respond to reports of gunshots being fired in the area of 600 East Queen Street, in Tyler, Texas. Officer Matthew Riggle responded to the call with Probationary Officer Collin Hale. They were joined at the scene by Officer Brandon Lott. As the officers approached the intersection of Carlisle and Queen Streets, they heard gunshots being fired close by. The officers then exited their vehicles and moved in the direction of the gunshots. The officers then heard additional gunshots and saw muzzle flash coming from the backyard of 603 East Queen Street. They then moved along a driveway on the western side of the house towards the backyard. When they entered the backyard, they saw Victor Fuentes holding a revolver. Riggle identified himself as a police officer and ordered Fuentes to drop the gun. Lott turned on his weapon's light, pointed it at Fuentes, and also identified himself as a police officer and ordered Fuentes to drop the gun. Fuentes said nothing, did not drop the gun, and returned into the house.

Riggle's account of what happened next is as follows. Riggle claims that he followed Victor Fuentes into the house, purportedly to maintain his line of sight on Fuentes. As Riggle entered the doorway, Riggle claims that he again instructed Fuentes to drop the weapon. Riggle stated in his affidavit that he saw Fuentes standing ten to twenty feet from him, facing towards him, pointing the revolver directly at him. Riggle then fired his rifle several times and shot Victor Fuentes.

Officer Lott entered the house and placed hand restraints on Fuentes. Lott stated that as he entered, he saw that Fuentes had been holding a revolver and that there was live ammunition around Fuentes. Lott heard that others were in an adjoining room in the house and kept them back from the scene.

2

No. 14-41003

At the same time, Juan Fuentes, Victor Fuentes's father, came out of a storage room to the left of the back door of the house—the storage room is a separate room but it has no door.  The back door to the house to some degree obstructs the entrance to the storage room, though to what extent is unclear from the photographs in the record.  Juan Fuentes was directed to sit on a retaining wall in the backyard.

At 12:10:56 a.m., Riggle radioed dispatch that shots had been fired and requested EMS to respond "code" to the officers' location.  The ambulance arrived at 12:15 a.m.  The EMT report states that there was "a [sic] unknown calabar [sic] revolver partially exposed from underneath pt buttock" and that "[t]here was also several bullets [sic] laying around pt body."  The paramedics determined that Victor Fuentes was dead at the scene.

That night, Juan Fuentes was taken to the police station for an interview.  Juan Fuentes was provided with an interpreter and had an attorney present.  During the interview, the interviewing officer, Officer Roberts, asked Juan Fuentes whether Victor Fuentes had a gun that night:

| | |
|---|---|
| Roberts: | Did Victor fire a gun today? |
| Fuentes: | I don't know. |
| Roberts: | Did you see him with a gun today? |
| Fuentes: | No. |

. . .

| | |
|---|---|
| Roberts: | Has he ever seen him with a gun? |
| [Interpreter]: | (Speaking Spanish) Have you seen your son with a gun? |
| Fuentes: | No. |
| Roberts: | Has he seen him with a gun tonight? |
| [Interpreter]: | (Speaking Spanish) Did you see your son with a gun tonight? |
| Fuentes: | No. |

The officer returned to the subject later in the interview:

No. 14-41003

| Roberts: | Did Victor have anything in his hands that could be perceived as a weapon? |
|---|---|
| Fuentes: | I don't know. I don't know. I don't know. |
| Roberts: | Did he point … [indicating interruption] |
| Fuentes: | No. He no do nothing to him. |
| Roberts: | Did Victor have a gun? |
| Fuentes: | He no do nothing to him, I say … [indicating interruption] |
| Roberts: | I know. Did Victor have a gun? |
| Fuentes: | … [cont'd] to get killed. He no do nothing to the police man to get killed. |
| Roberts: | I understand. I'm asking you: did Victor had [sic] a gun in his hand. |
| Fuentes: | I don't know. I don't know. |
| Roberts: | Could he have had a gun in his hand? |
| Fuentes: | Me? |
| Roberts: | No. Victor. |
| Fuentes: | I don't know. |
| Roberts: | Could he have had a gun in his hand? |
| Fuentes: | I mean, you're going to find out. I don't know. |
| Roberts: | Well, I'm asking you if you saw one. |
| Fuentes: | No. |

Juan Fuentes also gave a deposition in this case in which he recounted the shooting:

> Q. Tell me what happened next then.
> A. As I told you before, my son, Victor, came to me and told me, "It's time to go give my mother a -- her hug," which as I told you before he didn't get to do.
>      He turned around about three steps, and then we heard that someone had opened the door. At the same time when the door was open, he walked in about maybe one or two steps, and he said, "Hands up," and shoot.
> Q. Is that all you remember about what happened before the officer shot Victor?
> A. That's all that happened. He walked in and shot him. No reason or anything.
> Q. Did Victor have a gun in his hand when the officer shot him?
> A. I didn't see him with a firearm at all.

4

No. 14-41003

He continued:

> Q.    Where were the guns that you had been shooting?
> A.    (Indicating) As I told you, there is an opening right there, and there is a dresser where my wife puts clothes, so it's where I put them.  On top of it.
> Q.    And Victor was walking away from you towards the front of the house at the double doors?
> A.    Correct.
>
> . . .
>
> Q.    Did you see Victor at the moment he was shot?
> A.    Yes.  As I told you, he was walking.
> Q.    Right.  You saw him before the officer shot his gun, you saw Victor walking away?
> A.    Correct.
> Q.    Then the officer you say opened the door and the door hit you on the right shoulder?
> A.    Correct.
> Q.    And then the officer shot Victor?
> A.    Right at the time when he -- when he entered, he shot him.
> Q.    So, when the door hit you, did it stop you from seeing Victor at the moment he was shot by the officer?
> A.    No.  No, because it does not close all the way.  There was an opening and it's where I was seeing.  The door could not go the way because I was in between, so there was an opening.
> Q.    And the officer came in, he said something to Victor, correct?
> A.    Yes.  He did.  He said, "Hands up," at the same time he shot him.
> Q.    Did Victor -- was Victor looking at the officer or was he looking at the double doors going into the front of the house?
> A.    He was not looking at him.  He was facing the front -- the double doors.  I think when he was shot, he tried to turn to see.
>
> . . .
>
> Q.    Was Victor facing the double doors to the front at the moment the officer shot him?
> A.    That's correct.

5

No. 14-41003

. . .

Q.     Did Victor have anything in his hand when the officer fired his shots?

A.     No, I don't think so.

Q.     Prior to the moment when the officer fired his shots, had you ever seen Victor touch one of your guns that evening?

A.     I didn't see him.

Q.     Has anyone ever said to you that they saw Victor holding one of your guns on December 31, 2013 (sic)?

A.     No.

Q.     Was Victor holding any bullets in either of his hands when the officer fired his shots?

A.     No, I didn't see him.

Q.     Could you see Victor's hands when the officer came in to the room?

A.     I saw him -- I saw him, I saw his body and his hands, and he was walking.  What do you mean by that?  But I didn't see him carrying anything in his hands.

Q.     But could you see -- actually see his hands?

A.     Yes.  Yes.  As he was walking.

Q.     When the officer fired his shots, where were Victor's hands?

A.     He was – he was walking.

Q.     Were his hands down by his sides, or were they up higher?

A.     His hands were not up.  I cannot actually explain to you where his hands were because he was walking, but they were not up.

Q.     So, were they in normal as you walk with your hands towards your hips?

A.     Yes.  When he shot him, I don't know what went through his mind, but he kind of jerked.

Now, he used to do that when he played.  He liked to play, kind of like making, like, a jerk, kind of like (demonstrating) "What's up?"  But he would do that just to play, and that's what he did when he was shot.  But he didn't raise his hands up.  He kind of, like, made a sudden movement.

6

No. 14-41003

An autopsy was conducted on Victor Fuentes on January 1, 2013. The autopsy showed that Victor Fuentes had been shot three times. Two of the bullets struck Victor Fuentes's chest and abdomen. The medical examiner states in her affidavit that "[t]wo of the bullet wounds are consistent with Victor Fuentes standing, facing toward the officer, with his right arm outstretched and right hand pointed toward the officer, when the officer shot Victor Fuentes." The third bullet struck Fuentes in the back of the neck, then "[a]fter perforating the skin and subcutaneous tissue, the bullet perforates the musculature of the posterior neck and posterior left side of the back before perforating the posterior left fourth rib." "The bullet then penetrates the lower lobe of the left lung where a small-caliber, moderately deformed, copper-jacket with its base is recovered." According to the autopsy report, "[t]he directions of the bullet are back to front, downward, and right to left." In her affidavit, the medical examiner states that "[n]one of the bullet wounds are consistent with Victor Fuentes being upright, walking away from the officer, with his back to the officer, and with his arms and hands down at his sides, when the officer shot Victor Fuentes."

Victor Fuentes's family brought suit against Riggle, the chief of police, and the City of Tyler.[1] The plaintiffs allege that Riggle violated Fuentes's Fourth Amendment rights by affecting an unreasonable search of the house and by using excessive force in shooting and killing Fuentes. They also allege that Riggle violated Fuentes's constitutional rights by demonstrating deliberate indifference to Fuentes's medical needs in the immediate aftermath of the shooting. Riggle moved for summary judgment on the basis of qualified

---

[1] The plaintiffs advised the district court at the hearing on the defendants' motions for summary judgment that they no longer opposed summary judgment on their claims against the city and the chief of police. As such, those claims were dismissed and are not part of this appeal.

immunity. The magistrate judge recommended denying Riggle's motion for summary judgment. Noting the conflict between Riggle's account of the shooting and Juan Fuentes's, the magistrate stated "[c]onsistent with the Seventh Amendment, assigning comparative weight to Mr. Riggle's and Juan Fuentes's contradicting testimony, and weighing that testimony in light of other circumstantial evidence, is precisely the function of the jury." The magistrate judge also rejected Riggle's argument that, based on the other physical and testimonial evidence in the case, no reasonable jury could return a verdict for the plaintiffs. The magistrate judge continued, "Juan Fuentes is no doubt subject to impeachment at trial, both for his potential bias and allegedly inconsistent statements, but Defendant's request that this Court weigh his testimony against Mr. Riggle's" conflicts with the summary judgment standard. The magistrate judge found "that there is a material question of fact here: whether the decedent was holding a gun, pointed at Mr. Riggle, at the time he was shot." The district court adopted the magistrate judge's recommendation and denied the motion for summary judgment. Riggle filed a timely interlocutory appeal.[2]

## II.

Our first consideration is our jurisdiction to hear this appeal. We have jurisdiction only to hear appeals from "final decisions of the district courts of the United States." 28 U.S.C. § 1291. "Although a denial of a defendant's motion for summary judgment is ordinarily not immediately appealable, the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (citing

---

[2] The report and recommendation does not address Appellees' denial of medical care claim. Regardless, Appellees expressly abandoned that claim at oral argument in this appeal.

*Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).    Yet the scope of our interlocutory review of a denial of qualified immunity is confined "to the extent that the denial of summary judgment turns on an issue of law."  *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013) (internal quotation marks and brackets omitted).    Officials enjoy qualified immunity so long as their "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).    This court has explained that "[w]henever the district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly."  *Kinney*, 367 F.3d at 346.    The first determination is "'that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law.'"  *Hogan*, 722 F.3d at 730 (quoting *Kinney*, 367 F.3d at 346).    The second is "that a 'genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct.'"  *Juarez v. Aguilar*, 666 F.3d 325, 331 (5th Cir. 2011) (quoting *Kinney*, 367 F.3d at 346).    "According to the Supreme Court, as well as our own precedents, we lack jurisdiction to review conclusions of the *second* type on interlocutory appeal."  *Kinney*, 367 F.3d at 346.    Rephrasing this holding, the en banc court in *Kinney* stated that, "in an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."  *Id.* at 347; *see also Johnson v. Jones*, 515 U.S. 304, 313 (1995) ("We now consider the appealability of a portion of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial.  This kind of order, we conclude, is not appealable.").    "As one of our cases succinctly puts it,

No. 14-41003

'we can review the *materiality* of any factual disputes, but not their *genuineness.*'" *Kinney*, 367 F.3d at 347 (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)); *compare id., with* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Riggle makes three arguments in contending that the district court erred in denying his motion for summary judgment.  First, he argues that Juan Fuentes's testimony that he did not "see" Victor Fuentes holding a gun at the time of the shooting is insufficient as a matter of law to preclude summary judgment.[3]  Second, Riggle argues that Juan Fuentes's deposition contradicts his prior statements in a police interview and therefore should have been disregarded. *Cf. S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.").  Third, Riggle argues, citing *Scott v. Harris*, 550 U.S. 372 (2007), that Juan Fuentes's testimony is so thoroughly contradicted by the

---

[3] Riggle premises this argument on *Royal v. Spragins*, 575 F. App'x 300 (5th Cir. 2014) (unpublished) (per curiam).  In *Royal*, we held that a witness's testimony that he did not "see" the victim of an officer-involved shooting point his gun at the officers was insufficient to create a fact issue precluding summary judgment where the officers all testified that the victim did point the gun at them. *Id.* at 304–05.  Riggle attempts to expand *Royal* into a per se rule that a witness's testimony that he did not "see" the shooting victim with a gun is insufficient to defeat summary judgment and that only testimony that the victim *in fact* did not have a gun is sufficient.  But the testimony in *Royal* was insufficient because the witness also testified that he was not looking at the victim at the time of the shooting, not because of the witness's diction. *Id.* at 304.  Further, a witness's testimony that he did not see the victim pointing a gun at the officers immediately before a shooting is far less probative—and under the facts in *Royal*, not probative at all—of the fact issue of whether the victim was pointing a gun at the officers at the time of the shooting than testimony that the witness did not see the victim holding a gun at all immediately prior to the shooting would have been. Nevertheless, despite our skepticism, we do not pass on this argument as we lack jurisdiction, as explained *infra*.

10

other evidence in the summary judgment record that no reasonable jury could return a verdict in favor of the plaintiffs. But all of these arguments go to the genuineness of the factual dispute, not its materiality. Riggle does not argue that if he in fact shot an unarmed Victor Fuentes in the back, he did not violate Victor Fuentes's clearly established constitutional rights. His argument is that the district court erred in concluding that sufficient facts were in the record to permit such a factual finding. That is a classic argument that the factual dispute was not genuine, and we therefore lack jurisdiction over his appeal. *See Duran v. Sirgedas*, 240 F. App'x 104, 109–10 (7th Cir. 2007) (unpublished) ("Officer Peslak claims that the district court should have stricken this affidavit because it contradicted the previous testimony Moreno gave in her deposition. . . . [U]nder *Johnson*, we lack jurisdiction in this case to review the challenge to Moreno's affidavit, as such a challenge is, in essence, an attack on the district court's conclusion as to whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."). As such, we do not address the merits of Riggle's arguments and must dismiss this appeal for lack of jurisdiction.[4]

Riggle attempts to circumvent our jurisdictional limitations by arguing that whether a reasonable jury could return a verdict in favor of the plaintiffs is a "question of law." Yet summary judgment—and all of its facets—is always a question of law. The final judgment rule, however, places limits on which questions of law are subject to interlocutory review. Were we to accept Riggle's argument, the distinction drawn in our cases between questions of genuineness

---

[4] We also do not express any opinion as to whether the principle in *S.W.S. Erectors*, that a party cannot create a fact issue by writing an affidavit that impeaches prior sworn testimony, applies to a case, like this one, where the first statement was not sworn but rather was made during a police interview—though we note that no federal court of appeals has done so and one has rejected such an approach. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996) (rejecting application of the rule barring creation of a fact issue through testimony that impeaches prior sworn testimony where the initial statements were unsworn statements to third parties, including police officers).

No. 14-41003

and questions of materiality would be obliterated. We would be left conducting a plenary, de novo review of the district court's decision on the summary judgment motion. Riggle's argument therefore fails.

Nevertheless, we must pause for a moment to consider Riggle's argument predicated on *Scott v. Harris*. In *Scott v. Harris*, the Supreme Court heard an appeal from a denial of summary judgment on qualified immunity grounds and held that the district court erred in accepting the plaintiff's version of facts as correct when an undisputed video recording of the car chase at issue existed. 550 U.S. at 376, 380–81. In *Scott*, a police officer ended a high-speed pursuit by ramming the fleeing suspect's car off the road, rendering the suspect a quadriplegic. *Id.* at 374–76. Considering an appeal from the district court's denial of summary judgment, the Supreme Court noted that while the norm at summary judgment is to adopt "the plaintiff's version of the facts," the situation is altered where there is "a videotape capturing the events in question." *Id.* at 378. The Court concluded that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. The Court stated that "[t]he Court of Appeals should not have relied on such visible fiction [i.e., the plaintiff's version of events]; it should have viewed the facts in the light depicted by the videotape." *Id.* at 380–81. The Court then went on to address the legal standard for Fourth Amendment excessive force claims and to apply it to the facts as shown in the videotape. *Id.* at 381–86. While the question of jurisdiction does not appear to have been raised, the Supreme Court later assumed that it had found that it had jurisdiction in *Scott*. *See Plumhoff v. Rickard*, --- U.S. ---, ---, 134 S. Ct. 2012, 2020 (2014) ("The District Court order here is not materially distinguishable from the District Court order in *Scott v. Harris*, and in that case we expressed no doubts about

the jurisdiction of the Court of Appeals under § 1291."). Jurisdictionally speaking, *Scott* is problematic, as deciding whose version of the facts must be accepted falls squarely within the realm of a dispute as to genuineness. *Scott* could be interpreted one of two ways. First, *Scott* may merely indicate that, if (and only if) there is a dispute of the materiality of a factual issue, the court need not evaluate the materiality issue while accepting an account of the facts plainly discredited by undisputed documentary evidence. Under such an interpretation, we would lack jurisdiction over an argument that there is no genuine dispute because of the existence of a videotape without an accompanying contention that the factual dispute is immaterial. Alternatively, *Scott* may stand as an exception to the general rule, that the genuineness of a fact dispute cannot be reviewed, where there is undisputed documentary evidence that contradicts a plaintiff's factual account. *See Romo v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013) ("The *Scott* opinion did not even mention the *Johnson* holding, and *Scott* is easily limited as an exception for blatantly contradicted facts."). The second interpretation is problematic, as it would extrapolate a significant, and nebulous, exception to the general rule in *Johnson* from an opinion (*Scott*) that never addresses jurisdiction. Yet we need not pass on whether or to what extent such an exception exists, as *Scott* is plainly inapplicable here. *See George v. Morris*, 736 F.3d 829, 835–36 (9th Cir. 2013) (expressing skepticism that "*Scott v. Harris* implicitly abrogated a line of precedent" but rejecting *Scott*'s application to the case even assuming that it did); *Blaylock v. City of Philadelphia*, 504 F.3d 405, 412–14 (3d Cir. 2007) (observing that *Scott* "may represent the outer limit of the principle of *Johnson v. Jones*—where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review" but then distinguishing *Scott* and concluding "[b]ecause the officers make no arguments regarding the false

arrest claim that do not ask us to contradict the District Court's determination of which facts are subject to genuine dispute, we will dismiss that portion of their appeal for lack of jurisdiction under *Johnson v. Jones*."). There is no undisputed, contemporaneous recording of the disputed events here, as there was in *Scott*, or its equivalent. As such, *Scott*, and any exception it may portend from the normal jurisdictional limits in an appeal from a denial of a motion for summary judgment, does not apply.

Riggle has no doubt marshalled evidence that tends to undermine Juan Fuentes's account of Victor Fuentes's death. His arguments that such evidence precludes the existence of a genuine dispute of fact for purposes of Rule 56(a) are, however, not cognizable in an interlocutory appeal.

### III.

We therefore DISMISS the appeal for lack of jurisdiction.