NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0733n.06

No. 13-4065

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Sep 19, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TOMMY BAKER and JENNIFER JONES, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| UNION TOWNSHIP, et al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

BOGGS, Circuit Judge: Officer Michael Ventre, along with his employers, Union Township and the Union Township Board of Trustees, appeals the district court's denial of the defendants' motion for summary judgment and its consequent denial of Officer Ventre's defense of qualified immunity. For the reasons below, we affirm the district court's denial of summary judgment as to the claim of qualified immunity and dismiss the appeal of the remaining claims for lack of jurisdiction.

I

On February 14, 2011, plaintiff-appellee, Tommy Baker, went to the Union Township VFW toward the end of a night of heavy drinking. Shortly after his arrival, Baker was asked to leave by the bartender because he was engaged in a tense, aggressive discussion with another patron. The discussion devolved into a fight, prompting the bartender to call the police and inform Baker that the authorities were on their way.

1

Baker left the VFW through the front door, saw the police, did an about-face, and immediately reentered the building. Seeking to avoid the police, Baker then exited the building through the back door and, leaving his car in the parking lot, began to run (Baker called it "jogging") to his house, some 200 yards away. Claiming to have heard and seen nothing of the police as he ran across the parking lot, Baker's next memory was of being hit in the leg, feeling pain, and falling to the ground, the consequence of a taser shot. Baker, panicked by the taser and his fall, removed the probe and ran the rest of the way to his house with the police in pursuit.

Having arrived at his house, Baker shut and locked the front door and told his girlfriend not to allow the police to enter. Baker heard an immediate knocking and, as he was standing near the doorway to the basement staircase, saw Officer Ventre enter the house. Ventre tased him a second time. Incapacitated and unable to grasp the handrail to arrest his fall, Baker fell down the steps to the basement and suffered severe injuries including a broken neck.

The parties' narratives diverge sharply at the point of the second tasing. Baker claimed that he stood still in the doorway to the basement stairs and did not move when Ventre entered the house. Baker testified that he only "twisted [his] body" "[a]s he was tasing me." Baker was emphatic in his testimony that he did not move or attempt to go down the stairs to the basement before he was tased. He was equally emphatic that Ventre issued no warning and gave no verbal commands before deploying his taser. Baker also stated that it was not dark in the house when Ventre entered and that the taser probe hit him in the front, on the left side of his chest.

Officer Ventre, on the other hand, testified that he tased Baker in the back after Baker, who was clenching his fists and ignoring verbal commands, opened the door to the basement in an apparent attempt to flee. Ventre also claimed that the house was dimly lit and that he was

2

unaware that the door led to a staircase until after he had tased Baker and observed him motionless at the bottom of the stairs.

Baker was charged with obstructing official business, disorderly conduct while intoxicated, and resisting arrest. Pursuant to a plea agreement, he entered a guilty plea only to the charge of resisting arrest.

On February 7, 2012, Baker and his girlfriend, Jennifer Jones, filed a complaint against Officer Ventre, Union Township, and the Union Township Board of Trustees. The claim alleged three counts: a claim for excessive force against both Union Township and Ventre under 42 U.S.C. § 1983, a claim for assault and battery against Ventre alone, and a claim for negligent infliction of emotional distress by Jennifer Jones against Ventre alone. The complaint sought compensatory damages from all defendants and punitive damages from Ventre.

The defendants moved for summary judgment, claiming that Ventre was entitled to qualified immunity and that Baker's claim against Union Township was meritless. The district court granted in part and denied in part, dismissing the claim of negligent infliction of emotional distress by Jennifer Jones and most of Baker's claims against Union Township. The district court denied summary judgment as to Baker's § 1983 and assault and battery claims against Ventre. It also denied summary judgment as to Baker's § 1983 claim against Union Township under a theory of ratification by failure to meaningfully investigate. This appeal followed.

II

Summary judgment is appropriate when the evidence, "taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009). *See* Fed. R. Civ. P. 56(a). As explained below, the court's

review of a denial of qualified immunity at the summary judgment stage must necessarily be confined to questions of law. Accordingly, the court reviews the district court's denial of summary judgment de novo. *See McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996).

### III

The Courts of Appeals have jurisdiction to hear appeals from "all final decisions of district courts." 28 U.S.C. § 1291. Typically, the Courts of Appeals cannot hear interlocutory appeals unless the appeal is provided for by statute or the appeal is among the exceptional cases governed by the collateral-order doctrine. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). *Cohen* provides for immediate appeal of a narrow set of "collateral orders" that "finally determine claims of right separable from, and collateral to, rights asserted in the action" which are "too important to be denied review." *Cohen*, 337 U.S. at 546.

Orders that fall within the ambit of *Cohen* are those that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Archie v. Lanier*, 95 F.3d 438, 441–42 (6th Cir. 1996). Typically, denials of summary judgment, which are interlocutory, do not come under the collateral-order doctrine and are therefore rarely immediately appealable. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008). Any appeal from an adverse summary judgment decision must normally wait until the final disposition of the case.

Despite this, district court orders denying motions for summary judgment based on claims of qualified immunity are an exception. Such denials of summary judgment are immediately appealable under the collateral-order doctrine because qualified immunity, (which is an immunity from suit, not merely from liability) "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

4

But that does not settle the matter. The Supreme Court has limited the central holding of *Mitchell* so that a district court's denial of a motion for summary judgment based on a defendant's claim of qualified immunity is immediately appealable, but only "to the extent that it turns on an issue of law." *Id.* at 530. This limitation was later cited by the Supreme Court in *Johnson v. Jones*, 515 U.S. 304, 313 (1995), when it held that a defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial." *Id.* at 319–20. In fact, for the Supreme Court to have held otherwise would have been to require the appellate courts to pass on the accuracy of the district courts' interpretation of the pretrial record, thereby inserting the appellate courts into the district courts' realm of fact-finding. *See Romo v. Largen*, 723 F.3d 670, 678 (6th Cir. 2013) (stating that the district courts "have more experience sifting through convoluted factual records"). Thus, "a district court's determination that there exists a triable issue of fact *cannot* be appealed on an interlocutory basis, even when that finding arises in the context of an assertion of qualified immunity." *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006). Or, put another way, "a determination that a given set of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable." *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007).

The rule that an appeal of a district court's denial of summary judgment based on a claim of qualified immunity will lie insofar as it raises purely legal questions has come to mean that "if the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009).

5

The defendant must be willing to concede the plaintiff's version of the facts. This requirement is so stringent that this court has held that "[o]nce a defendant's argument drifts from the purely legal into the factual realm . . . our jurisdiction ends and the case should proceed to trial." *Berryman v. Rieger*, 150 F.3d 561, 564–65 (6th Cir. 1998). *See also McKenna v. City of Royal Oak*, 469 F.3d 559, 561 (6th Cir. 2006) (stating that the court lacks jurisdiction when the appellant argues based only on disputed facts); *Berryman* at 565 ("Because the defendants' appeal attempts to persuade us to believe their version of the facts, we must dismiss the appeal."). *But see Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002) (stating that so long as "the legal issues are discrete from the factual disputes, we may exercise our jurisdiction to resolve the legal issues only").

Here, though the appellant defendants refer to the disputed facts in their brief on appeal, they concede the plaintiffs' version of the facts for the purposes of the appeal in their reply brief. This court can, therefore, exercise jurisdiction over the defendants' interlocutory appeal.

IV

Examination of a qualified-immunity claim is a two-part inquiry. First, the panel must determine, "whether a constitutional right would have been violated on the facts alleged." "[A]ssuming the violation is established," the second part of the inquiry is whether the "right was clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The two parts of this inquiry need not be addressed in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). This test ensures that, even if a defendant violates the plaintiff's constitutional rights, the defendant will receive qualified immunity unless the right violated was clearly established at the time of the incident.

Following *Saucier*, we must first determine whether the plaintiff's constitutional rights were violated at all. In the context of Fourth Amendment excessive-force claims, this question is answered under the "objective reasonableness" test articulated in *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The *Graham* test requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests . . . ." *Id.* at 396. When conducting this test, the reviewing court cannot use "the 20/20 vision of hindsight." *Ibid.* Instead, the official's actions must be viewed from "the perspective of a reasonable officer on the scene." *Ibid.* *Graham* requires the court to examine "the facts and circumstances of each particular case" balancing "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.*

In conducting the second inquiry, determining whether the rights violated were "clearly established," we must first define the right at issue. In doing so, the Supreme Court has warned that we should not define the right in question at "a high level of generality." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). This holding ensures that, on the one hand, we do not define the right so broadly as to declare all police misconduct within the realm of clearly-established law. On the other hand, it also ensures that we not define the right so narrowly that, to be actionable, the circumstances of the alleged violation must be identical to cases already decided. The correct balance must be struck because, while the requirement that law must be clearly established is the lynchpin of the analysis, officers can still be "on notice that their conduct violates established law, even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Fundamentally, the "dispositive inquiry . . . is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In summary: if, in light of the facts as alleged by the plaintiff, we conclude that the plaintiff's constitutional rights were violated under *Graham's* "objective unreasonableness" test and further conclude that the right violated was "clearly established," then we must affirm the district court's denial of summary judgment because a potential set of facts warranting recovery has been demonstrated as a matter of law. If, on the other hand, the plaintiff fails on either or both parts of the qualified immunity inquiry, we should reverse because no set of facts could be proven that warrant recovery and the defendant's qualified-immunity right not to stand trial should be protected.

A

In determining whether a constitutional right was violated, we must ask whether Ventre's actions were "objectively unreasonable" under *Graham*, understanding that "[l]aw enforcement officers are inevitably required to make difficult, split-second decisions regarding the amount of force needed in a particular situation, and not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001) (internal quotation marks and alterations omitted).

In this case, taking the facts in the light most favorable to the plaintiff, Ventre's actions were objectively unreasonable and therefore violated Baker's constitutional rights. According to the facts as alleged and conceded, Ventre confronted a non-violent misdemeanant suspect who had been, but was no longer, fleeing, standing at the top of an observable staircase and offering no resistance or indication of aggression. Further, under the facts conceded, Ventre said nothing,

gave no warnings or commands—he simply shot Baker with his taser, incapacitating Baker and causing him to fall down the staircase to the basement and suffer a broken neck.

None of the three *Graham* factors militate toward a use of violent force to apprehend Baker. *See Graham*, 490 U.S. at 396. First, the crime at issue was not severe. Though Ventre was responding to a call from the VFW's bartender regarding disorderly patrons, it is not entirely clear from the record what Ventre suspected Baker of having done at the time Baker fled. At most Baker was probably suspected of a non-violent misdemeanor.

Second, when Ventre tased Baker, Baker was not threatening Ventre or anyone else. Under the conceded facts, Baker "did not have his fists clenched or assume a fighting stance" and demonstrated no danger to anyone, and, although it is true that Baker was highly intoxicated and that a suspect's intoxication can add to a situation's volatility, under the facts conceded, Baker was not behaving aggressively at the time of his second tasing. *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007).

Finally, Baker was no longer resisting arrest or attempting to flee at the time Ventre tased him at the top of the staircase. The defendants specifically conceded that Baker "did not move once Officer Ventre entered the home" and that Baker "did not have his fists clenched or assume a fighting stance." (Reply Br. at 3). Although Baker had been fleeing before, he was not fleeing at the time of the second tasing. Under the facts conceded, Baker did not move until *after* Ventre deployed the taser.

Even looking at the second tasing from the vantage point of a reasonable officer on the scene, making as many allowances as possible for the split-second decision-making we ask of our law-enforcement officers, Ventre should not have tased Baker. According to the facts conceded, Baker "was standing in the middle of the hallway with the area lit and the door to the

9

stairs open." (Reply Br. at 3). It is widely known among law enforcement and was even a subject of Ventre's police training that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall.

*Graham* admonishes courts to conduct "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests . . . ." *Graham*, 490 U.S. at 396. Baker's second tasing was objectively unreasonable under the facts conceded. The government's interest in apprehending a non-fleeing, non-aggressive suspected misdemeanant in his own house without warning is outweighed by Baker's Fourth Amendment interest freedom from excessive force. Accordingly, Baker's constitutional right to be free from excessive force was violated.

B

Having established that Officer Ventre violated Baker's Fourth Amendment rights under *Graham*, we now turn to the second part of qualified-immunity analysis: the determination of whether the right violated was clearly established at the time of the incident. In making this determination the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier*, 533 U.S. at 202.

The right at issue can be expressed as Baker's right not to be shot with a taser without warning, while offering no resistance to arrest, and while standing on an observably elevated surface. This articulation comports with *al-Kidd's* mandate that rights not be defined at "a high level of generality" at the second step of qualified immunity analysis. *Al-Kidd*, 131 S. Ct. at 2084.

10

Examining the incident under the facts conceded, it is fairly certain that a reasonable officer would have been "on notice that [this] conduct violates established law" at the time Ventre tased Baker. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Baker was suspected of, at most, a minor, non-violent misdemeanor at the time he was tased. The police were called to the scene of a disturbance at the VFW. It is unclear what, exactly, the police suspected him of at the time they gave chase. The police did not even positively identify Baker as the suspect of the reported incident, they merely chased someone they saw running away. This is a far cry from the scenarios implicitly contemplated by *Graham* in which a heightened level of caution may be warranted in the apprehension of someone suspected of a violent felony.

Under the facts conceded, Baker did not resist arrest before Ventre deployed his taser the second time. "[T]he right to be free from physical force when one is not resisting the police is a clearly established right." *Wysong v. City of Heath*, 260 F.App'x 848, 856 (6th Cir. 2008). In the past, this court has held that an officer violates a suspect's clearly-established Fourth Amendment rights when "he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009). Other courts have held similarly. An arrestee's Fourth Amendment rights were violated when a police officer, seeking to arrest her in her house for the minor violation of failing to report a traffic accident, tased the unresisting arrestee without warning. *See Hardwick v. City of Cleveland*, No. 1:07-CV-01, 2007 WL 4260818, at *6–*7, (E.D. Tenn. Dec. 3, 2007). Excessive force was similarly found when an arrestee answered the front door and officers immediately tased him. *See Holzman v. City of South Bend*, No. 3:05-CV-316RM, 2006 WL 2788587, at *4, (N.D. Ind. Sept. 25, 2006). Here, Baker was not resisting arrest. In fact, because Ventre gave no warnings and

11

issued no commands once inside the house, it would have been impossible for Baker to resist at this time. Further, the defendants have conceded that Baker "did not have his fists clenched or assume a fighting stance." (Reply Br. at 3). A reasonable officer would have known that it was unlawful to deploy a taser against an un-resisting suspect standing stock-still in a well-lit hallway.

Moreover, Ventre should not have tased Baker without a warning. The tasing of a suspect without warning is, at the very least, an additional factor useful in determining whether an officer violated a suspect's Fourth Amendment right to be free of excessive force. *See Asten v. City of Boulder*, 652 F. Supp. 2d 1188 (D. Colo. 2009) (finding that the tasing of a woman in her own house without a warning and before putting her under arrest violated clearly established law). Here, Ventre's tasing of Baker before giving Baker an opportunity to comply with instructions was a violation of clearly established law.

Further, Baker was not fleeing at the time of the second tasing. Flight is a form of resisting arrest and flight alone has been held to warrant deployment of a taser, even for non-violent misdemeanants. *See McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011) (finding that police use of a taser on a suspect fleeing from a second-story window not unreasonable despite the suspect's resultant death from falling). However, if a suspect is neither fleeing nor resisting arrest, case law holds that deployment of a taser violates the suspect's Fourth Amendment right to be free from excessive force. *See Watson v. Zurcher*, No. C07-0374RAJ, 2008 WL 2858504, at *5 (W.D. Wash. July 22, 2008) (finding excessive force in tackling and tasing a compliant, non-fleeing suspect). This is especially true in cases where the suspect is already in custody. "There is no governmental interest in striking someone who is neither resisting arrest nor trying to flee." *Wysong* 260 F. App'x at 855.

12

Finally, Baker posed no danger to Ventre at the time that Ventre tased him. Under the facts conceded, Baker was standing still in a well-lit hallway and did not adopt an aggressive posture toward Ventre. By the time of Baker's tasing, case law had clearly established that police may not tase a non-threatening suspect. *See Kijowski v. City of Niles*, 372 F. App'x. 595, 600 (6th Cir. 2010) (finding it a violation of plaintiff's Fourth Amendment rights for officer to tase him in his truck for failing to end a phone call to 911 when plaintiff showed no indication that he was violent or dangerous); *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 986 (N.D. Ohio 2008) (affirming denial of summary judgment to defendant officer accused of having "gratuitously tased" a handcuffed, non-dangerous suspect accused of a minor crime).

Since Baker's Fourth Amendment right to be free of excessive force was violated under the facts conceded and since that right was clearly established at the time of its violation, the plaintiff has alleged sufficient facts to defeat a grant of qualified immunity at the summary judgment stage. We therefore affirm the denial of summary judgment and remand the case to the district court to proceed to trial.

V

The appeals of the remaining two claims are dismissed for lack of jurisdiction.

The first is Baker's § 1983 claim against Union Township and the Union Township Board of Trustees for ratification by failure to investigate. As explained above, denials of summary judgment are not final orders and usually do not come under the collateral-order doctrine. Instead, they are interlocutory and are therefore not immediately appealable in their own right. It is for this reason that the appellants have tried to bring Union Township's claim alongside Ventre's.

13

Other than the exceptionally rare cases in which a second claim on interlocutory appeal is "inextricably intertwined" with the question of qualified immunity, there is no "pendent appellate jurisdiction" for third parties trying to piggyback on an appeal challenging a district court's denial of qualified immunity at the summary judgment stage. *See Swint v. Chambers County Com'n*, 514 U.S. 35, 49–50 (1995).

This is not such a case. The determination of Ventre's qualified-immunity claim does not necessarily dispose of the municipal-liability claim. Ventre could have successfully appealed the denial of his motion for summary judgment by demonstrating that he had a right to qualified immunity without that finding necessarily precluding liability for Union Township. Since Baker's § 1983 claim against Union Township rests on a theory of ratification by failure to investigate, an ultimate finding of municipal liability would be possible even if Ventre were to have been found to be protected by qualified immunity. This could happen, for example, if the district court were to find that the Union Township ratified Ventre's misconduct which, though unconstitutional, was not in violation of clearly-established law. In such a case, provided the requirements of *Monell* and *Marchese* are met, Ventre would be entitled to qualified immunity but the municipality could still be found independently liable. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) (allowing § 1983 liability for municipal authorities based on the authority's unconstitutional policies); *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985) (finding that a county sheriff's failure to investigate his deputies' beating of an inmate constituted "ratification" of the deputies' violation of the plaintiff's constitutional rights). Because Baker's claim against Union Township is not "inextricably intertwined" we dismiss the appeal as to this claim for want of jurisdiction.

14

Finally, Ventre appeals the denial of summary judgment as to Baker's claim for assault and battery. This too is an interlocutory appeal over which the court has no jurisdiction. Like the municipal-liability claim above, Ventre's defense of qualified immunity is neither "inextricably intertwined" nor "coterminous with" the claim for assault and battery. The two claims can be considered, in fact *must* be considered, independently.

In Ohio, officials acting within the scope of their official responsibilities and who do not have liability otherwise imposed upon them by statute can only be found liable for their wrongdoing under state law if "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03.

This inquiry has absolutely nothing to do with whether or not an official is entitled to qualified immunity under federal law and success as to one does not guarantee success as to the other. Subjective intent, the basis by which Ventre could defeat liability under Ohio law, has no place in federal qualified-immunity analysis. In conducting Fourth Amendment inquiries, the Supreme Court has "almost uniformly rejected invitations to probe subjective intent" because the Fourth Amendment "regulates conduct rather than thoughts." *Al-Kidd*, 131 S. Ct. at 2080. Since Ventre's appeal of the denial of his summary-judgment motion as to the assault-and-battery claim is interlocutory and is wholly distinct from his appeal denying qualified immunity, we likewise dismiss for lack of jurisdiction.

VI

For the reasons above, we AFFIRM the district court's denial of summary judgment as to the defendant's qualified immunity claim and DISMISS the appeal of the denial of summary judgment as to appellants' municipal-liability and assault-and-battery claims for lack of jurisdiction.

15