NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0362n.06

No. 14-5859

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

JERMAINE SUTTON,

      Plaintiff-Appellee,

v.

METROPOLITAN GOVERNMENT OF
NASHVILLE & DAVIDSON COUNTY, et al.,

      Defendant,

and

RICHARD MARTIN, in his individual and official
capacities as a Metro Police Officer,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
May 14, 2015
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

**BEFORE:**    **BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.**

**SUHRHEINRICH, Circuit Judge.**

This is a second interlocutory appeal by Defendant Richard Martin. He appeals the

district court's order denying his motion for summary judgment based on qualified immunity.

We affirm.

## I.  BACKGROUND

### A.  Facts

The district court on remand provided a thorough summary of the facts that we incorporate here:

> During the evening of April 21, 2009, John Szcerbiak ("Szcerbiak"), a Kroger loss prevention officer, observed a black male placing packages of baby-back ribs in the waistband of his pants. Szcerbiak contacted John Bouchard, another loss prevention officer, and instructed him to try to cut the suspect off at the front of the store. While being followed by Szcerbiak, the suspect became alarmed and started running around the store, during which time packages of ribs and a cell phone fell to the ground. After a couple of minutes, the suspect ran outside the store with Bouchard in pursuit. Bouchard chased the subject across the Kroger parking lot and into the woods. Bouchard claims that the suspect was at least "six-two, six-three," with bushy hair and a beard that appeared to have been growing for several days.
>
> After chasing the suspect into the woods, Bouchard called 911 at 6:20 p.m., and identified the suspect as a black male wearing a red and black plaid jacket or shirt, and blue jeans.FN1 Officer Martin responded to the call.
>
>> FN1. Bouchard told the dispatcher that during the encounter the suspect's jacket was pulled off. Since this may have been a reference to the "red and black plaid jacket or shirt," the Court will limit this description going forward to a thief wearing blue jeans.
>
> The Kroger store is on Old Hickory Boulevard, across a multi-lane street from Summit Medical Center ("Summit"). Officer Martin claims that after arriving at the Kroger store he was told the suspect was a black male of medium build and approximately 6 feet tall. Szcerbiak told Martin that he could positively identify the suspect if he were to see him again, and that he desired to press charges were the suspect caught.
>
> Using the cell phone recovered at the scene, Officer Martin called the first contact in the phone. This contact turned out to be Arginer Richardson who, when asked if she knew anyone in the area where the cell phone was found, told Officer Martin that her godson, Jermaine Sutton, worked at Summit. Officer Martin ran a computer check on "Jermaine Sutton" and found that individual had a

criminal history (although no felony convictions or any convictions for theft). The picture associated with the name was that of an African American male with a medium build. According to the dispatch call recordings, Officer Martin radioed another officer and told him that the suspect was "working up here at Summit," and that he was "gonna run-up in here real quick and try to get him."

Officer Martin's drove to Summit to speak with Jermaine Sutton and was directed by security to the cafeteria where Plaintiff was working. When asked by Officer Martin about the phone found at the Kroger store, Plaintiff produced his own cell phone. This apparently did not allay Officer Martin's suspicions because, in his experience, criminal suspects are likely to have more than one cell phone.

Plaintiff is a black male and stands 5′10″. When approached by Officer Martin, Plaintiff was clean cut and beardless. He was wearing black hospital scrubs and nice shoes.

On the day in question, Plaintiff worked the 10:45 a.m to 7:15 p.m. shift as a utility assistant in the kitchen. He claims that he took a lunch break from 1:00 to 1:30 p.m., and then a smoke break from 5:45 to 6:00 p.m. Plaintiff claims that he drove around the perimeter road of Summit during his smoke break because the hospital is a smokefree campus.

Between 7:00 and 7:15 p.m., Plaintiff was working the dishwasher when he was told by the cashier that someone was there to see him. He went into the cafeteria and was met by four officers. Officer Martin was the first to speak and began by asking Plaintiff about the location of his phone. Officer Martin then asked Plaintiff what he thought the odds were that someone listed in the contacts of the cell phone found at the Kroger store would give police his name. Plaintiff responded that he did not know, but that the cell phone was not his.FN2 Plaintiff also claims that Officer Martin said that he (Plaintiff) looked "like a player" and could have two phones so that his wife would not know that he was "messing around on nurses."

   FN2. As it turns out, the cell phone belonged to David Booker.

During the discussion in the cafeteria, one of the officers said that Plaintiff had mud on his shirt from when he fell in the creek. Plaintiff did not know what he was talking about and said that the dirt on his shirt was from food particles from cleaning the dish-washing machine.

At some point, Officer Martin asked Plaintiff to sign a citation in lieu of being taken into custody. However, Plaintiff refused because he did not want to admit to something that he did not do and would lose his job were he to sign the citation.

According to Victoria Ndiaye, another utility worker, she worked with Plaintiff the entire day of the incident. They both took a break at around 5:45 p.m. that would have lasted no more than 10 minutes because they had to be back on the line by 6:00 p.m., although she concedes that during the break she went to the break room while Plaintiff went outside to smoke. She also claims that the spots on Plaintiff's clothing were from the foam used to clean the dish machine. She claims that she told the officers that Plaintiff had been at work with her, but the officers did not seem interested in hearing from her.

After approximately 15 to 20 minutes, Plaintiff, flanked by Officer Martin and another officer, was escorted from the cafeteria to the visitor's entrance at the front of the hospital. After approximately two to three minutes, Mr. Szcerbiak and Mr. Bouchard arrived by car and stopped five to seven car lengths from Plaintiff and the officers. Mr. Szcerbiak immediately identified Plaintiff as the shoplifter.

Officer Martin handcuffed Plaintiff and put him in the back seat of his police car. Again Plaintiff was given the opportunity to sign a citation, but he refused.

Plaintiff was then driven to the Kroger store and, upon arrival, Officer Martin went inside to view the videotape. After doing so, he came back out to the car and said that he wanted to take another look at the videotape to be sure. Mr. Bouchard came out to the police car and told both Officer Martin and Plaintiff that the [sic he] did not think Plaintiff was the man captured on the videotape. Plaintiff then asked Officer Martin if he heard that, and Officer Martin said that he had to go on what Mr. Szcerbiak said, but that he would give Plaintiff the benefit of the doubt and look at the tape again.

After viewing the tape at least one more time, Officer Martin returned to the vehicle and told Plaintiff that Mr. Szcerbiak wanted to press charges. Mr. Bouchard said he did not want to sign the arrest warrant because he did not think Plaintiff was the shoplifter.

After approximately 45 minutes, Plaintiff was driven to the police station. Office Martin wrote an affidavit for theft for Mr. Szcerbiak to sign. Mr. Szcerbiak signed it as the "prosecutor," and Officer Martin was listed as the arresting officer.

> Plaintiff was booked, fingerprinted, and jailed for approximately four hours until his wife was able to post bond. Plaintiff was tried and acquitted of the theft charge on June 26, 2009. This litigation followed.

*Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:10-0400, 2014 WL 3386035, at *1-3 (M.D. Tenn. July 9, 2014).

## B. Procedural History

### 1. The First Appeal

Sutton sued Martin, the Metropolitan Government of Nashville and Davidson County, the Kroger Company, John Szcerbiak, and John Doe Security Company, alleging violations of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights, as well as state-law claims of false arrest and false imprisonment. Martin moved to dismiss based, in part, on qualified immunity. The district court refused to dismiss Sutton's Fourth Amendment claim and he filed an interlocutory appeal. This court affirmed the denial of Martin's motion to dismiss, for failure to state a claim, but we also substantially narrowed the scope of the Fourth Amendment claim against Martin. *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865 (6th Cir. 2012) (holding that Sutton failed to state a claim that officer Martin lacked reasonable suspicion required to detain Sutton during the initial contact and questioning. Sutton sufficiently alleged that Martin detained him beyond the scope of the initial detention, Szcerbiak's identification of Sutton as the shoplifter provided probable cause to arrest, but Sutton adequately pleaded that he was arrested without probable cause, and Martin was not entitled to qualified immunity).

We first concluded that Martin's initial encounter with Sutton was an investigatory detention supported by reasonable suspicion because a cell phone had been found in the Kroger store where an attempted theft had just occurred and a "contact" in the phone told Martin that her godson, Jerome Sutton, worked at Summit Hospital. *Sutton*, 700 F.3d at 873-74. We stated that

"[t]he permissible scope of Officers Martin's initial detention of Sutton was to ascertain his identity and to ask limited questions regarding the cell phone found at the Kroger store." *Id.* at 874 ("These are 'the circumstances that initially justified the stop.'"). When Martin asked Sutton about the cell phone, "the restraint on Sutton's freedom was quite limited, and the *Terry* stop had not converted into an arrest." *Id.* We noted that "[h]ad Sutton's detention ended here, his Fourth Amendment rights would not have been violated." *Id.*

However, Martin discounted the exculpatory information that Sutton provided by "wildly speculating" that Sutton would likely have two cell phones because he looked like the type of guy who was "running around with nurses" and wanted to hide that fact from his wife. We held that Martin could not use "pure speculation" to turn a blind eye toward "potentially exculpatory evidence." *Id.* (internal quotation marks and citation omitted). "Having received an answer to his cell-phone inquiry that did not produce more suspicion and knowing no other facts that could justify the investigatory detention, Officer Martin lacked a reasonable basis for detaining Sutton any further." *Id.* We then concluded that: "The facts as alleged thus allow us to draw the reasonable inference that Officer Martin was at that point detaining Sutton without reasonable suspicion, in violation of the latter's Fourth Amendment rights." *Id.*

Next, we opined that Sutton's continued detention "amounted to an arrest prior to Szcerbiak's identification" because it "went beyond questioning Sutton about the cell phone and had several characteristics of 'a show of authority' that the Supreme Court has found tantamount to an arrest." *Id.* at 875 (citing *Florida v. Royer*, 460 U.S. 491, 501-04 (1983) (plurality opinion)). These included the fact that "Sutton was surrounded by four officers, told that he was a suspect, had his property confiscated, and then was grasped by the arm and escorted away from

his place of work." *Id.* Martin also told Sutton that he "'could not go anywhere or do anything.'" *Id.* This scenario exceeded the permissible scope of a *Terry* stop because

> Officer Martin's sole basis for suspecting that Sutton was the shoplifting perpetrator was an alleged connection to the cell phone found at the Kroger grocery store, and this basis was neutralized when Sutton produced a cell phone from his own pocket. Given the other *Royer*-like indicia of arrest discussed above, Sutton's forcible removal from the hospital exceeded the bounds of a *Terry* stop and was thus an arrest requiring probable cause. Officer Martin does not contend that he had probable cause to arrest Sutton absent Szcerbiak's identification. Sutton has therefore adequately pleaded that he was arrested without probable cause when he was removed from the hospital.

*Id.* at 876.

We therefore concluded:

> In sum, Officer Martin is protected by qualified immunity with regard to his initial contact with Sutton and in continuing to detain Sutton after the latter was positively identified by Szcerbiak. But the allegations of Officer Martin's conduct between those two events are sufficient to state a claim that precluded qualified immunity at this stage in the litigation.

*Id.* at 878.

## 2. On Remand

On remand, the parties conducted discovery. Martin moved for summary judgment. The district court recognized that the sole question was "whether Officer Martin had probable cause to arrest [Sutton] before he was identified by Szcerbiak." *Sutton*, 2014 WL 3386035, at *6. The district court found that fact issues precluded summary judgment.

In his motion for summary judgment Martin argued that he had probable cause to arrest Sutton because (1) Martin received Sutton's name from a contact listed in the phone dropped at the Kroger store; (2) Sutton matched the physical description of the subject; (3) Sutton was working less than a mile from the Kroger store; (4) Sutton admitted that he had taken a smoke

break and had not clocked out; (5) none of Sutton's coworkers could verify that Sutton had been at Summit the entire time; and (6) Sutton had a stain on his shirt that looked like mud. R. 78 at 7-8. Further, Martin asserts that he is adopting Sutton's version of events for purposes of determining whether he had probable cause. R. 98 at 1. *Id.*

Initially, the district court noted that Martin "insiste[d] that he was 'adopting *Sutton's* version of events.'" *Id.* (quoting R. 98-1). The district court posited that Martin chose this tactic because, during discovery, Martin's credibility had been drawn into question. Martin testified on deposition that he looked in *Roman's* locker and saw muddy clothing (but did not mention the clothing in his incident or arrest report or collect it as evidence). Yet Ndiaye and Sutton both testified that Sutton did not use a locker and that both came to work in their work clothes. Ndiaye also stated that none of the officers went to the lockers that night. Furthermore, by conceding plaintiff's version of events, Martin created a legal question that he could immediately appeal. *Id.*

The district court held that "[w]hile Officer Martin purports to adopt [Sutton's] version of the events, he has not actually done so." *Sutton*, 2014 WL 3386035, at *7. First, although Martin claimed that Sutton matched the description of the suspect, Sutton matched the description "only in the broadest sense—he, like the perpetrator, was a black male of medium build." *Id.* Furthermore, the first call to 911 indicated that the suspect was wearing blue jeans, and Sutton was wearing black scrubs when Martin confronted him. *Id.*

Second, although Sutton admitted that he had taken a smoke break without clocking out, Sutton testified in his deposition that he took the smoke break at 5:45 p.m. and was back on the

job by 6:00 p.m.  The initial 911 call did not occur until 6:20 p.m.  In that call, Bouchard stated that the suspect was in the woods.  *Id.*

Third, while Martin claimed that no one at Summit could verify that Sutton was at the hospital the entire day, Ms. Ndiaye testified that she was with Sutton except during the 5:45 p.m. break, which lasted only about ten minutes.  *Id.*

Fourth, Martin's contention that the stain on Sutton's clothing appeared to be mud, "presume[s] that the stain actually looked like mud, and ignore[d] the fact that both" [Sutton] and Ndiaye testified that spots on [Sutton's] clothing were common occurrences from cleaning the dish machine."  *Id.*  Moreover, even if Martin were right, "this add[ed] nothing to probable cause" since the suspect was allegedly wearing blue jeans.  *Id.*

The district court concluded that, considering the evidence in a light most favorable to Sutton, "the very factors upon which Officer Martin relies to establish probable cause show the existence of numerous disputed issues of fact."  *Id.*

The district court rejected Martin's alternative argument that he was entitled to qualified immunity.  Relying on the rationale of the first appeal, the district court held that "[s]ince the only basis in the record for Officer Martin approaching [Sutton] was the possible connection to the cell phone found at the Kroger store, the continued detention of [Sutton] after he produced his own phone amounted to an arrest," and violated clearly established law established in *Terry*. *Id#.* The court rejected Martin's testimony that in his experience, many suspects carry more than one cell phone, holding that "[t]his beg[ged] the question of why Officer Martin even asked questions about [Sutton's] cell phone, since [Sutton] would be doomed no matter how he answered."  *Id.* at *8.  That is, if Sutton had said he did not have a cell phone, Martin would have

concluded that the cell phone was Sutton's. The court rejected as "self-serving" Martin's

testimony that in his experience, criminals have more than one cell phone. *Id.*

The district court concluded:

> Officer Martin's explanation for discounting Plaintiff's possession
> of a cell phone aside, he adds little from the discovery record to
> support his claim that there was probable cause to detain Plaintiff.
> Prior to going to Summit, Officer Martin ran Plaintiff's criminal
> record, but that record was minor and contain[ed] no charges
> related to theft. Officer Martin knew that Summit was in close
> proximity to the Kroger store, and that the suspect was a black
> male of medium build. When Officer Martin arrived at Summit,
> however, he was met by an individual who was not wearing
> anything close to the type of clothing described in the 911 call, and
> the individual before him (at least if Plaintiff's version of events is
> believed) had an alibi backed by a co-worker account.

*Id.* The court held that the law was clearly established and denied qualified immunity for

a second time. *Id.*

### 3. Second Interlocutory Appeal

In this second interlocutory appeal, Martin argues that the district court erred in denying

him qualified immunity because (1) he had probable cause to detain Sutton for 15-20 minutes to

await eyewitness identification and (2) Sutton cannot carry his burden of showing that no

reasonable officer would have believed that he had probable cause to detain Sutton to await an

eyewitness identification.

## II. STANDARDS OF REVIEW AND APPLICABLE LAW

We review de novo the district court's denial of a defendant's motion for summary

judgment on qualified immunity grounds. *Stoudemire v. Mich. Dep't of Corrs.,* 705 F.3d 560,

565 (6th Cir. 2013). Summary judgment is proper if there is no genuine issue as to any material

fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Stoudemire*,

705 F.3d at 565. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Stoudemire*, 705 F.3d at 565. We view all facts and draw all reasonable inferences in favor of the nonmoving party. *Id*.

A government official is shielded from § 1983 liability if his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden rests on the plaintiff to show that the defendant is not entitled to qualified immunity. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Thus, a plaintiff must show that the defendant violated a constitutional right and that the right was clearly established. *Pearson*, 555 U.S. at 232.

"The Fourth Amendment guarantees that government officials may not subject citizens to searches or seizures without proper authorization." *Sutton*, 700 F.3d at 871 (internal quotation marks and citation omitted). A warrantless arrest does not violate the Fourth Amendment if the officer had probable cause to believe a crime had been committed. *Id*. An officer possesses probable cause when the facts and circumstances within the officer's knowledge at the moment of arrest are sufficient to warrant a prudent man in believing that the plaintiff had committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). A probable cause determination is based on the "totality of the circumstances," and must take account of "both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). As a general rule, the existence of probable cause in a § 1983 action is a jury question, unless there is only one reasonable determination possible. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. #1995).

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001),

*overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009); *Sutton*, 700 F.3d at 871.

As this court recently explained:

> [in] determining whether the rights violated were "clearly established," we must first define the right at issue. In doing so, the Supreme Court has warned that we should not define the right in question at "a high level of generality." *Ashcroft v. al–Kidd*, ––– U.S. ––––, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011). This holding ensures that, on the one hand, we do not define the right so broadly as to declare all police misconduct within the realm of clearly-established law. On the other hand, it also ensures that we not define the right so narrowly that, to be actionable, the circumstances of the alleged violation must be identical to cases already decided. The correct balance must be struck because, while the requirement that law must be clearly established is the lynchpin of the analysis, officers can still be "on notice that their conduct violates established law, even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

*Baker v. Union Twp.*, 587 F. App'x 229, 233 (6th Cir. 2014).

## III. ANALYSIS

We initially consider Sutton's motion to dismiss this appeal for lack of appellate jurisdiction.

"A defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *Romo v. Largen*, 723 F.3d 670, 674 (6th Cir. 2013). Our jurisdiction at the interlocutory stage is limited to "pure issues of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Sutton*, 700 F.3d at 871. On an interlocutory appeal from a denial of qualified immunity, the defendant must concede the plaintiff's version of the facts. "Once a defendant's argument drifts from the purely legal into the factual realm . . . our jurisdiction ends and the case should proceed to trial." *Berryman v. Rieger*, 150 F.3d 561, 564-65 (6th Cir. 1998). *See also McKenna v. City of Royal*

*Oak*, 469 F.3d 559, 561 (6th Cir. 2006). *But see Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (stating that "this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue" only).

Martin claims that he had probable cause to detain Sutton until Sutton could be identified by an eyewitness. He claims that the district court erred for the following seven reasons. First, the district court focused on Martin's credibility, instead of focusing on the undisputed facts. That is, he claims that the district court did not need to make a credibility assessment since he had conceded Sutton's version of the facts. Second, the court rejected as "self-serving" undisputed evidence in the record, such as Martin's testimony that, in his experience, suspects often carry more than one cell phone, and the court seemed to disregard the expert testimony of Lt. Gilder to that effect as well. Third, the court improperly focused on Sutton's production of his cell phone, because under Sutton's version of the facts, no one ever told Martin that the phone found at Kroger belonged to Sutton. "Thus, Officer Martin would not have been questioning Sutton as the possible owner of the phone, but only as a name connected with the phone." Appellant's Br. at 21. Fourth, the court focused on facts that were not learned until after Sutton's detention at Summit, rather than focusing on what Martin knew at the time. In this regard, Martin notes that what Sutton said in his deposition was not relevant because there is no evidence in the record that anyone told Martin about the timing of Sutton's smoke break. Fifth, the court erred in concluding Sutton matched the suspect's description in only the broadest sense, simply because Bouchard testified that the suspect was much taller than Sutton. Sixth, the court erred in rejecting the evidence of mud on the shirt because nothing in the record showed that Martin knew that the spots could have been from the dishwashing machine. Seventh, the court erroneously disregarded the mud on Sutton's shirt on the ground that the suspect was described

as wearing blue jeans. "Certainly suspects have been known to change clothes, and it is not beyond the realm of reasonableness for Officer Martin to believe that Sutton managed to change his muddy blue jeans before the detention but left on a shirt that had a few mud stains." Appellant's Br. at 24.

Martin (1) mischaracterizes *his* version of the facts as Sutton's, (2) asks us to draw all inferences in his favor, and (3) ignores evidence procured during discovery. Having drifted far afield into the factual realm, we do not have jurisdiction over the contested fact questions in this case. *See Berryman*, 150 F.3d at 564-65.

Two examples suffice to illustrate the point. First and foremost, Martin asks us to draw the inference that he was not questioning Sutton as the owner of the phone, but merely as a name connected with the phone. However, as the district court noted, one could easily infer that Martin or any other reasonable officer could have believed the owner of the cell phone dropped it during the theft. Thus, once Sutton produced his own phone, suspicion dropped away from Sutton. We do not have jurisdiction to resolve such opposing inferences. *See Romo*, 723 F.3d at 874 (stating that "[i]n adjudicating this appeal, we are required by the limitations on interlocutory appeals of qualified immunity denials to accept the district court's finding that a genuine dispute of material fact existed"); *see also id.* at 678 (6th Cir. 2013) (Sutton, J., concurring) (disagreeing with majority's holding that, "when a district court determines that there is a 'genuine issue of fact' for trial by drawing an inference in favor of the plaintiff, the appellate court may not second-guess that inference, indeed lacks jurisdiction to do so").

Second, Martin said he saw a mud-like stain on Sutton's shirt and that he knew the suspect had run through a creek. But Sutton and Ndiaye said the stain was from the dish-

washing machine. Furthermore, the suspect allegedly wore jeans. A reasonable inference could be drawn that the jeans should have been mud-stained, too. In his deposition, Martin said that he saw the muddy clothing in the locker. But he did not mention the muddy clothing in his incident or arrest report and did not collect the clothing as evidence. Furthermore, Ndiaye testified that Sutton did not use a locker and that they both came to the hospital in their work clothes. A fact finder needs to decide not only if Martin lied about the jeans, but whether his belief that Sutton's shirt had mud from the creek on it-was plausible.

Martin also argues that even if he lacked probable cause to detain Sutton, the law was not so clearly established that he should have realized it. At the time of Sutton's arrest, the law was clearly established that an officer needed probable cause, *i.e.*, a reasonable belief that the plaintiff had committed a crime, based on the totality of the circumstances, including both inculpatory and exculpatory evidence. *See Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001) (observing that "to have probable cause to arrest, a police officer must take into account all the evidence–both inculpatory and exculpatory–that he has at the time of the arrest. Where the police have sufficiently inculpatory evidence to give rise to a determination of probable cause and they do not know of any exculpatory evidence, we have held that 'the failure to make a further investigation does not negate probable cause.'") (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 173 (6th Cir. 1987)). If Sutton's version of the facts is correct, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Because if Sutton is correct, after he pulled his cell phone out of his pocket, all Martin knew was that (1) the cell phone found at the scene of the theft had as an anonymous contact the "god mother" of Sutton, (2) Sutton worked across the street, (3) Sutton was a black male about six feet tall with a medium build, (4) Sutton was wearing scrubs, (5) Sutton had

stains on his clothing from the dishwasher, and (6) a coworker had offered an alibi. This does not add up to probable cause to believe that Sutton attempted to steal the baby-back ribs.

## IV. CONCLUSION

In sum, we hold that the district court correctly concluded that fact issues remained and therefore uphold its order denying summary judgment to Martin on the basis of qualified immunity. *See Romo*, 723 F.3d at 675, 678.[1] **AFFIRMED.**

---

[1] To the extent Sutton is also seeking qualified immunity on his state-law claim that too is denied for the same reason that questions of material fact exist.